

FILED

Feb 16 2016, 8:34 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS

Bradford R. Shively
Jonathan R. Slabaugh
Sanders • Pianowski, LLP
Elkhart, Indiana

ATTORNEY FOR APPELLEE

Patrick F. O'Leary
Goshen, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Best Formed Plastics, LLC, and Jane Stewart, <br> *Appellants-Defendants,* <br><br> v. <br><br> George Shoun, <br> *Appellee-Plaintiff* | February 16, 2016 <br><br> Court of Appeals Case No. 20A03-1506-PL-651 <br><br> Appeal from the Elkhart Superior Court <br><br> The Honorable Gretchen S. Lund, Judge <br><br> The Honorable Thomas A. Murto, Magistrate <br><br> Trial Court Cause No. 20D04-1302-PL-45 |

**Crone, Judge.**

# Case Summary

Best Formed Plastics, LLC ("BFP") and Jane Stewart appeal the trial court's entry of judgment on jury verdicts in favor of their former employee George Shoun. Shoun sustained a shoulder injury while at work and subsequently filed a worker's compensation claim. His employment was later terminated. He sued BFP and Jane, one of its owners, for retaliatory discharge, defamation, and invasion of privacy by false light, claiming among other things, that he was fired in retaliation for filing a worker's compensation claim.

Following a trial, the jury found in Shoun's favor on the retaliatory discharge and invasion of privacy claims and awarded him a total of $412,680 in compensatory and punitive damages. On appeal, BFP asserts that the trial court erred as a matter of law in entering judgment on the jury's verdict against BFP for retaliatory discharge. BFP and Jane also contend that the trial court abused its discretion in refusing certain jury instructions. Finally, BFP and Jane claim error regarding the damages awards. Finding no error or abuse of discretion, and determining that BFP and Jane have waived one of their assertions of error, we affirm.

# Facts and Procedural History

The relevant facts favorable to the verdicts indicate that BFP is a family-owned plastic fabricating business operated in Elkhart. Jimmy Stewart established BFP in the fall of 2006. He is the president and 50% owner of the company; his wife Jane is the secretary and treasurer and 48% owner; and his son Jeb is the

production manager and 2% owner. Shoun began working for BFP in June 2007. Shoun was a high school friend of Jimmy's and had continued to be a close friend through the years, even serving as the best man in Jimmy and Jane's wedding. Prior to commencing his employment at BFP, Shoun received specific training on the operation of a type of plastic fabricating machine called a CNC machine. While working at BFP, Shoun performed various duties including operating a double-table CNC machine, driving a truck for deliveries, repairing and maintaining equipment, and designing programs for the machines. Shoun's primary work over the last several years, however, involved operating an automatic thermoforming machine.

[4] The automatic thermoforming machine was akin to a large oven. To operate the machine, Shoun was required to lift pieces of raw plastic material and place them into molds. Most of the pieces of raw plastic were between two and ten pounds, with a few being around fifteen pounds. On very rare occasions, a piece of plastic would weigh over twenty-five pounds. In addition to lifting and moving raw plastic material, Shoun was required to set molds into and remove molds from the thermoforming machine. Because a single mold could weigh up to 800 pounds, Shoun used a forklift to both set and remove molds. Shoun's operation of the thermoforming machine did require some overhead lifting.

[5] On Friday, March 9, 2012, fifty-eight-year-old Shoun fell and dislocated his shoulder while attempting to secure an airline that had come loose from the automatic thermoforming machine. Shoun remained off work for one week and returned to work with medical restrictions on Monday, March 19, 2012.

He was prohibited from lifting more than five pounds with his left arm and from performing overhead lifting. Accordingly, Shoun performed duties such as sanding, drilling, counting, numbering, and packaging small parts. It was determined that Shoun would perform this light-duty work until, May 21, 2012, the day before he was scheduled to take medical leave for shoulder surgery.

[6] On May 14, 2012, Jane sent an email to BFP's insurance agent regarding Shoun's upcoming surgery and medical leave and the possible financial repercussions that a worker's compensation claim could have on BFP. Jane wrote,

> After my conversations with you last week, we decided it would be in the best interest of BFP to pay George Shoun[']s payroll directly after his surgery rather tha[n] Workmans Comp pay his w[a]ges in order to lessen the hit on our premium for the next couple of years.
>
> I just got off the phone with the Workmans Comp contact an[d] she advised me that after George's surgery and recovery, he will be awarded when the claimant is at medical maximum improvement a "Permanent Par[tial] Impairment Rating" and could be awarded anywhere between $5000 - $14,000.00! This money would come from the Workmans Comp fund or from [BFP]. No one knows the exact amount until the end of the process.
>
> Based upon this new infor, I am not sure we should pay George directly. I am just [wanting] to do the right thing to lessen any more costs to BFP.

Appellee's App. at 62.

Also, while Shoun was working the day before his scheduled surgery, Jeb Stewart accused Shoun of "buffalo[ing]" the doctors and the insurance company and that he had "everybody fooled." Tr. at 652. Jeb told Shoun that he knew better and that there was nothing wrong with him because "a woman can shove a baby head out of her p***y and in five (5) days be back to work." *Id*. On May 22, 2012, Shoun had surgery on his shoulder and began receiving payments through worker's compensation.

While Shoun was on medical leave following surgery, Shoun was contacted by his worker's compensation caseworker who informed him that BFP had a position open for a CNC operator. The CNC machine operation involved fabricating parts that weighed only a few pounds each and could be done within Shoun's continued medical restrictions of lifting no more than five pounds with his left arm and no overhead lifting. Accordingly, Shoun reported back to work at BFP on August 13, 2012. A few days later, Jeb angrily approached Shoun and told him that, while he was gone, he had "cost the company a lot more than just production." *Id*. at 656. Thereafter, Jeb seemed continually mad at Shoun and treated him poorly. Shoun felt as if Jeb was intentionally harassing him so, on August 29, Shoun told one of the worker's compensation insurance adjusters about it. The adjuster told Shoun that she was going to "make a call because this ha[s] to stop." *Id*. at 659. The following day, Jimmy and Jeb confronted Shoun with two disciplinary incident reports written about Shoun that alleged incidents on August 22 and 28. Shoun disputed the claims in both

reports but was told by Jeb that he had no choice but to sign and acknowledge the reports.

[9] Shoun continued to work at BFP as a CNC operator, under the same medical restrictions as before, until September 17, 2012. Jeb approached Shoun at the end of his shift and told him that BFP would not have any work for him for the rest of the week. Unbeknownst to Shoun, the next day, Jane spoke with the worker's compensation insurance adjuster and told her that "due to lack of work," BFP would not have Shoun come in for the remainder of the week and likely not the following week either, but that if "sales rise, we will bring him back." Appellee's App. at 23. No other employee of BFP was told that their services were no longer needed due to this alleged downturn in sales. In fact, BFP's tax returns show that sales steadily increased between 2012 and 2013. That same day, Jane told BFP's insurance agent to cancel "all insurance" for Shoun. *Id.* at 20. Shoun returned to work on Monday, September 24, 2012. Jeb simply told Shoun that there was no work for him and that it may be a couple of weeks before BFP would have more work. When Shoun's girlfriend, Cathy, learned of the insurance cancellation, she called Jane for an explanation. Jane told Cathy that Shoun's "employment here has been terminated" and that he "will never work here again." Tr. at 544.

[10] In mid-December 2012, Jimmy sent a letter to Shoun in response to a request from Shoun for a summary of his 2012 wages. Jimmy began the letter,

> We have heard from many people of your displeasure with this
> whole work injury situation, advising all whom you have spoken

to as you put it, "we are [f***king] you." This along with you are milking the workmans comp issue since you could make more money staying at home and selling weed.

Appellee's App. at 79.

On February 14, 2013, Shoun filed a complaint for damages against BFP alleging that BFP wrongfully terminated his employment by firing him in retaliation for making a worker's compensation claim. On February 19, Jane made a post to her Facebook account that read:

> Isn't it amazing how Jimmy experienced a 5 way heart bypass just one month ago and is back to work, especially when you consider George Shoun's shoulder injury that kept him away from work for 11 months and now he is trying to sue us. Love for everyone to hear the real truth! What a loser!

*Id.* at 24. This post remained on Jane's Facebook account for seventy-six days until she took it down on May 6, 2013.

Shoun subsequently filed an amended complaint against BFP and Jane and added claims for invasion of privacy by false light and defamation. In October 2014, BFP moved for summary judgment on the retaliatory discharge claim. That motion was denied by the trial court. A four-day jury trial began in January 2015. During trial, among other things, Shoun testified that he performed various jobs when he was originally hired by BFP and that there was "no doubt" in his mind that he could still operate the thermoforming machine despite his current medical restrictions. Tr. at 648. Shoun explained to the jury

in detail how the thermoforming machine operated. He also explained how his medical restrictions applied only to his left arm and that he could easily use that arm as a guide while using his uninjured right arm to bear any necessary weight, including during overhead lifting.

[13] Following Shoun's presentation of evidence, BFP and Jane moved for judgment on the evidence. The trial court denied the motion. After BFP and Jane presented their evidence, they renewed their motion for judgment on the evidence, and the motion was again denied. Before the jury received final instructions, BFP and Jane objected to the trial court's refusal to give to the jury their tendered instructions regarding the law applicable to a claim for retaliatory discharge. The court overruled the objection and instead read to the jury alternative instructions regarding the law applicable to retaliatory discharge. Thereafter, the jury was given separate verdict forms to fill out regarding each of Shoun's three claims.

[14] Following deliberations, the jury returned a verdict in favor of Shoun and against BFP on Shoun's retaliatory discharge claim, awarding him $337,680 in compensatory damages for lost income and benefits. The jury also awarded Shoun $50,000 in punitive damages on that claim. Regarding Shoun's defamation claim, the jury returned a verdict in favor of BFP and Jane. As for the invasion of privacy by false light claim, the jury returned a verdict in favor of Shoun and against BFP and Jane. On the verdict form, the jury left the line designated for compensatory damages blank, but wrote "$25,000" on the line designated for punitive damages. Appellants' App. at 39. After the trial court

read the verdicts in open court, the court asked the parties for any motions. BFP and Jane requested a polling of the jury and the jurors indicated their unanimous decision as to each verdict. The trial court entered judgment on the jury verdicts on February 5, 2015.

[15] BFP and Jane subsequently filed a motion to correct error. The trial court denied the motion following a hearing. This appeal ensued.

## Discussion and Decision

## Section 1 – The trial court did not err as a matter of law in denying BFP's motion for judgment on the evidence and entering judgment on the jury's verdict against BFP on Shoun's retaliatory discharge claim.

[16] BFP[1] asserts that the trial court erred as a matter of law in entering judgment on the jury's verdict in favor of Shoun on his retaliatory discharge claim. Specifically, BFP claims that there was clear evidence that Shoun was – and for the foreseeable future would continue to be – physically unable to perform the functions of his pre-injury work, and therefore his retaliatory discharge claim is barred as a matter of law. We disagree.

[17] Although not procedurally framed as such by BFP, BFP essentially claims that it was entitled to judgment on the evidence and that the jury's verdict on Shoun's retaliatory discharge claim is contrary to law. Our standard of review

---

[1] In our discussion, we will refer to the appellants collectively as BFP.

for a challenge to a trial court's ruling on a motion for judgment on the evidence is the same standard that governed the trial court in making its decision. *J.E. Stone Tree Serv., Inc. v. Bolger*, 831 N.E.2d 220, 226-27 (Ind. Ct. App. 2005). Judgment on the evidence is proper only where "all or some of the issues…are not supported by sufficient evidence." Ind. Trial Rule 50(A). This Court looks only to the evidence and reasonable inferences drawn most favorable to the nonmoving party, and the motion should be granted only where "there is no substantial evidence supporting an essential issue in the case." *Smith v. Baxter*, 796 N.E.2d 242, 243 (Ind. 2003). "If there is evidence that would allow reasonable people to differ as to the result, judgment on the evidence is improper." *Id*. Where the issue involves a conclusion of law based upon undisputed facts, we determine the matter as a question of law in conjunction with the motion for judgment on the evidence, and to this extent, the standard of review is de novo. *Cavens v. Zaverdac*, 849 N.E.2d 526, 529 (Ind. 2006). In the end, we will not set aside a jury verdict unless the verdict is wholly unwarranted under the law and the evidence. *Bolger*, 831 N.E.2d at 227.

[18] A review of Indiana law regarding retaliatory discharge claims is appropriate here. "In general, an employment contract of indefinite duration is presumptively terminable at the will of either party." *Stillson v. St. Joseph Cnty. Health Dep't*, 22 N.E.3d 671, 679 (Ind. Ct. App. 2014) (citing *Pepkowski v. Life of Ind. Ins. Co.,* 535 N.E.2d 1164, 1168 (Ind.1989)), *trans denied* (2015). However, it is well settled in Indiana that an action for retaliatory discharge exists when an employee is discharged for exercising a statutorily conferred right, such as

filing a worker's compensation claim. *Purdy v. Wright Tree Serv., Inc.,* 835 N.E.2d 209, 212 (Ind. Ct. App. 2005), *trans. denied* (2006). In *Frampton v. Central Indiana Gas Co.,* 260 Ind. 249, 251-53, 297 N.E.2d 425, 427-28 (1973), our supreme court held that an employee-at-will who was discharged for filing a worker's compensation claim could file an action for retaliatory discharge against her employer because the Worker's Compensation Act was designed for the benefit of employees, and as such, its humane purpose would be undermined if employees were subject to reprisal without remedy solely for exercising that statutory right.

[19] This Court has outlined and consistently followed a three-step approach to a retaliatory discharge *Frampton* claim under Indiana law. First, the employee must prove, by a preponderance of the evidence, a prima facie case of discrimination. *Powdertech, Inc. v. Joganic,* 776 N.E.2d 1251, 1262 (Ind. Ct. App. 2002). Specifically, the employee must present evidence that directly or indirectly implies the necessary inference of causation between the filing of a worker's compensation claim and the termination. *Id.* Second, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the discharge. *Id.* If the employer carries its burden, the employee then has the opportunity to prove that the reason cited by the employer is a pretext. *Id.* He may establish pretext by showing that the reasons are (1) factually baseless; (2) not the actual motivation for his discharge; or (3) insufficient to motivate the discharge. *Id.* The question of whether a retaliatory motive exists for discharging an employee is a question for the trier of fact. *Id.* at 1261-62.

[20] Despite our clear precedent on the shifting burdens of proof in a retaliatory discharge claim, BFP cites to authority from other jurisdictions and urges us to declare "as a matter of law" that Shoun's retaliatory discharge claim is barred (and should never have been submitted to the jury) because of what BFP claims to be "uncontroverted evidence" that Shoun was – and for the foreseeable future would continue to be – physically unable to perform the functions of his pre-injury work. Appellants' Br. at 22.[2] BFP's arguments are misplaced and appear to be based upon a misunderstanding of Indiana law.

[21] First, contrary to BFP's assertions, the evidence regarding what Shoun's pre-injury work actually was, and whether he was able to perform the functions of that work after his injury, was highly contested at trial. Moreover, pursuant to Indiana law, a retaliatory discharge claim is not short-circuited merely because the employer has articulated a nonretaliatory reason for discharge, such as the employee's physical inability to perform pre-injury work, as BFP asserted here. Indeed, the employee still has the opportunity to prove by a preponderance of the evidence that the reason cited by the employer is a pretext. *Powdertech,* 776 N.E.2d at 1262.

[22] We observe that undisputed evidence that an employee is physically unable to perform the tasks required by his pre-injury work could, under very specific circumstances, serve as a legitimate nonretaliatory basis for termination,

---

[2] We decline to cite to the numerous foreign cases relied upon by BFP, as they are factually and procedurally distinguishable, and the authority is neither binding nor persuasive under the circumstances presented.

potentially rendering a retaliatory discharge claim unsuccessful. *Compare Purdy,* 835 N.E.2d at 212 (affirming summary judgment for employer and concluding that employee failed to establish genuine issue of material fact that employer's stated reason for discharge, employee's medical inability to return to work, was a pretext), *with Dale v. J.G. Bowers, Inc.*, 709 N.E.2d 366, 370 (Ind. Ct. App. 1999) (reversing summary judgment and concluding that evidence could support inference that employer's stated reason for discharge, employee's inability to fulfill job duties due to medical restrictions, was a pretext). However, that is not to say that an employee should be summarily deprived of his ability to present evidence of pretext or that his claim for retaliatory discharge should be barred, as urged by BFP. This is certainly not, and never has been, the law in Indiana. Additionally, we believe that it would be contrary to the public policy underlying a *Frampton* claim to hold that an employer may not fire an employee in retaliation for filing a worker's compensation claim, but that an employer may fire an employee for the inability to return to his job due to the injuries that are the basis for the worker's compensation claim. This is especially the case where, as here, an employee is discharged well before the full extent of permanent injury is known.[3] We decline BFP's invitation to alter or expand our well-settled law.

---

[3] Shoun's maximum medical improvement, or MMI, was not determined until December 28, 2012, more than three months after his employment was terminated. Defendant's Ex. EE.

[23]   BFP does not dispute, and therefore effectively concedes, that sufficient evidence supports the jury's determination, pursuant to Indiana law, that BFP terminated Shoun's employment solely in retaliation for filing a worker's compensation claim.[4]   Accordingly, the trial court did not err in denying BFP's motion for judgment on the evidence and entering judgment on the jury's verdict in favor of Shoun on his retaliatory discharge claim.

[24]   We reach the same conclusion regarding BFP's related contention that the trial court erred as a matter of law in entering judgment on the jury's verdict awarding Shoun damages for lost wages and benefits on his retaliatory discharge claim.   While we will discuss the amount of the damages award later, BFP's claim that Shoun is not entitled to such damages as a matter of law is based upon the same inapplicable foreign authority as well as the alleged "uncontroverted evidence" that Shoun was unable to perform his pre-injury work.   Again, contrary to BFP's assertion, the evidence on this issue was vigorously contested.   We find no error.

## Section 2 – The trial court did not abuse its discretion in refusing BFP's tendered jury instructions.

[25]   BFP alternatively argues that the trial court erred as a matter of law in refusing its tendered jury instructions regarding (1) Shoun's inability to maintain a

---

[4] Specifically, BFP states that "whether there was sufficient evidence for the jury to find that [BFP] terminated Shoun's employment solely in retaliation for filing a worker's compensation claim is not relevant to the issues raised in this appeal."   Reply Br. at 5.

retaliatory discharge claim and (2) Shoun's inability to recover damages for lost wages on his retaliatory discharge claim. This Court has explained,

> The decision to give or deny a tendered jury instruction is largely left to the sound discretion of the trial court. We review the trial court's decision only for an abuse of that discretion. On review, we will reverse the trial court's refusal to give a tendered instruction when the instruction is a correct statement of the law; it is supported by the evidence; and it does not repeat material already covered by other instructions.

*Tucker v. Harrison*, 973 N.E.2d 46, 56 (Ind. Ct. App. 2012) (citations omitted), *trans. denied* (2013).

[26] We find it unnecessary to reproduce the proffered instructions here. For the reasons discussed above, the instructions tendered by BFP and refused by the trial court were neither supported by the evidence nor correct statements of Indiana law. The trial court did not abuse its discretion in refusing to give the instructions.

## Section 3 – The jury's compensatory damages award on Shoun's retaliatory discharge claim is not excessive.

[27] BFP challenges the jury's $337,680 compensatory damages award on Shoun's retaliatory discharge claim as excessive. The retaliatory discharge of an at-will employee constitutes an intentional wrongful act on the part of the employer for which the employee is entitled to be fully compensated in damages. *Haas Carriage, Inc. v. Berna*, 651 N.E.2d 284, 289 (Ind. Ct. App. 1995). Damages for retaliatory discharge may include compensatory and punitive damages, and the

compensatory damages may include both back pay and future pay. *Remington Freight Lines, Inc. v. Larkey*, 644 N.E.2d 931, 942 (Ind. Ct. App. 1994). Damages for lost income are assessed based upon a presumption of prospective employment, and while the gauge of the employee's losses "may not stretch on *ad infinitum*," the jury has the responsibility of determining what amount of time is reasonable. *Id*. Moreover, the employee has a responsibility to mitigate his damages, and if "the employee is able to find comparable employment, damages may be recovered for the period in which he is unemployed." *Id*. If, however, the employee is unable to find comparable employment, the jury should consider evidence on the difference between what the employee would have earned had he not been discharged, and what he actually did earn thereafter. *Id*.

[28] This Court applies a strict standard when reviewing a jury verdict containing a damages award claimed to be excessive or inadequate. *Dee v. Becker*, 636 N.E.2d 176, 177 (Ind. Ct. App. 1994). Traditionally, juries are afforded a great deal of discretion in assessing damage awards. *Ritter v. Stanton*, 745 N.E.2d 828, 843 (Ind. Ct. App. 2001), *trans. denied* (2002). On appeal, we consider only the evidence that supports the award together with the reasonable inferences therefrom. *Id*. If there is any evidence to support the amount of the award, even if it is conflicting, we will not reverse. *Id*. The verdict will be upheld if the award falls within the bounds of the evidence. *Id*. at 845.

[29] The jury's award here was clearly within the bounds of the evidence. Regarding past loss of income, evidence was presented that, as of the date of

trial, twenty-eight and one-half months had elapsed since the termination of Shoun's employment on September 17, 2012. Shoun's monthly income and benefits at the time of his termination was $3398.91. Although Shoun testified that he had been unable to find comparable employment during that time, he stated that he was able to obtain seasonal work at an orchard. The parties agree that, after subtracting unemployment and worker's compensation benefits received, as well as the wages he earned from the orchard, Shoun's total past loss of income was $71,809.36.

[30] BFP claims that the additional $265,870.64 in compensatory damages, which should account for Shoun's future loss of income and benefits, is excessive and without evidentiary support.[5] We disagree. Shoun testified that, had he not been terminated, he expected to work at BFP "at least" until age sixty-seven. Tr. at 704. The jury reasonably could have interpreted this to mean until or beyond age sixty-seven. Assuming monthly wages and benefits of $3398.91, and employment until age sixty-seven or age sixty-eight, Shoun's future loss of income and benefits would range between $234,524.79 and $275,311.71.[6] The jury's award was clearly within the bounds of this evidence. Moreover, it was

[5] Although the jury was instructed that it could also consider Shoun's mental anguish, emotional distress, and humiliation in its decision to award compensatory damages, the jury entered "$0" on the verdict form regarding these damages. Appellants' App. at 35.

[6] BFP made no claim at trial, and similarly makes none here, that the presumption of Shoun's prospective employment up to age sixty-seven, or approximately sixty-nine months after termination, was an unreasonable amount of time. Accordingly, we fail to see how the same presumption up to age sixty-eight, or somewhere in between, would then be unreasonable. Also, it would have been the jury's prerogative to make its calculation assuming a reasonable increase in wages and/or benefits during that time period.

squarely within the province of the jury to determine how much, if at all, to credit BFP for subsequent income that Shoun may or may not earn from the orchard. The law is well settled that, in a tort action, the verdict need not reflect precise mathematical certainty. *Larkey*, 644 N.E.2d at 942. BFP essentially asks that we reweigh the evidence and reach a different result than the jury, which we may not do. We cannot say that the jury's award was outside the scope of the evidence or excessive under the circumstances.

## Section 4 – BFP has waived our review of its assertion that the trial court erred in entering judgment on the jury's verdict regarding damages on Shoun's invasion of privacy claim.

[31] The jury returned a unanimous verdict against BFP on Shoun's claim for invasion of privacy by false light. However, on the verdict form, the jury left blank the line designated for the entry of an award for compensatory damages and entered "$25,000.00" on the line designated for the award of punitive damages. Appellants' App. at 39. BFP argues that the jury's award of punitive damages, but no compensatory damages, is contrary to Indiana law, and therefore the trial court erred in entering judgment on this verdict.

[32] Indiana courts have long held that punitive damages are not freestanding and that an award of actual damages is a prerequisite to an award of punitive damages. *Allstate Ins. Co. v. Axsom*, 696 N.E.2d 482, 485 (Ind. Ct. App. 1998), *trans. denied*. Indeed, punitive damages may not be awarded exclusively and must be "in addition to" actual damages. *Id*. "Successful pursuit of a cause of action for compensatory damages is a prerequisite to an award of punitive

damages." *Crabtree ex rel. Kemp v. Estate of Crabtree*, 837 N.E.2d 135, 137-38 (Ind. 2005). Our supreme court has explained that "punitive damages *may* be awarded as part of the damages to which a plaintiff may be entitled if successful under a recognized existing cause of action." *Yost v. Wabash College*, 3 N.E.3d 509, 514 (Ind. 2014).

[33] Regarding damages generally, the jury was instructed in pertinent part that "If you decide that the Plaintiff is entitled to recover, then in addition to compensatory damages, you may also award punitive damages" and "If you award punitive damages, you must state the amount of those damages on the verdict form separately from the amount of compensatory damages." Appellants' App. at 120-22. This language is susceptible to multiple reasonable interpretations, including that punitive damages may be awarded merely upon the decision that Shoun is "entitled to recover" on his invasion of privacy claim against BFP. The instructions do not dictate that a compensatory damages award is a prerequisite to a punitive damages award on each separate cause of action, and the instructions imply that as long as the amount of punitive damages awarded is stated separately on the verdict form, the award is proper. *See Hemings v. Redford Lounge, Inc.*, 485 N.E.2d 1378, 1385 (Ind. Ct. App. 1985) (concluding that similar jury instruction was susceptible to reasonable interpretation that punitive damages may be awarded upon finding of entitlement to compensatory damages although no compensatory damages in fact awarded; resulted in "confused and contradictory" verdict), *trans. denied* (1986). The jury may have been confused and unaware of its responsibility to

assess compensatory damages on the invasion of privacy by false light claim before it could also assess punitive damages. In any event, an inconsistent verdict regarding damages on this claim resulted.

[34] Despite the inconsistency, we conclude that BFP's failure to object to the verdict when it was returned has resulted in waiver of its challenge on appeal. *Young v. Ind. Dep't of Natural Res.*, 789 N.E.2d 550, 554 (Ind. Ct. App. 2003), *trans. denied*. The clear "purpose to objecting to the verdicts when they are read is to allow the trial court an opportunity to ask the jury to continue deliberations." *Id*. at 556. Here, after the trial court read the jury's verdicts, the court asked the parties for "any motions?" Tr. at 1164. BFP made no objection to the verdicts and requested only that the jury be polled. *Id*. Had BFP objected to the jury's verdict on the invasion of privacy claim as soon as it was returned, the trial court could have informed the jury of the inconsistency regarding the damages award and a proper verdict could have been reached. When the jury was discharged, "the opportunity to avoid the expense of a new trial was lost." *DDR Computer Serv. Bureau, Inc. v. Davis*, 411 N.E.2d 722, 727 (Ind. Ct. App. 1980). BFP is not permitted to sit back and "simply ignore the irregularity and hope for reversal on appeal." *Id*.

[35] We note that counsel for both parties, as well as the trial court, could have done more to better explain to the jury the legal principles involved in its award of

damages and the proper way to fill out the verdict forms.[7] In short, this inconsistent verdict could have been avoided. Nevertheless, BFP has waived the issue.[8] The judgment of the trial court is affirmed in all respects.

[36]  Affirmed.

Vaidik, C.J., and Bailey, J., concur.

---

[7] The record indicates that both parties agreed to the use of the specific verdict forms submitted to the jury. Tr. at 1018.

[8] We note that, even had we not found waiver, the most BFP could have hoped for would have been a new trial on the limited issue of damages for invasion of privacy by false light. *See Neher v. Hobbs*, 760 N.E.2d 602, 608 (Ind. 2002) (new trial shall be limited only to those issues affected by error). Because the jury determined that BFP caused Shoun harm for invasion of privacy by false light and also determined that BFP acted with malice or, at the very least, gross negligence, it is likely that a new trial solely on damages would result in an even less favorable outcome for BFP.